## GUY McKENZIE *et al.* v. STATE.

No. A-1995.   Opinion Filed June 17, 1915.

1.   **HOMICIDE—Evidence—Verdict—Punishment.**   In a prosecution for murder, the evidence examined and held to sustain a joint verdict of guilty with imprisonment for life at hard labor as the punishment.

2.   **TRIAL—Instructions—Sufficiency.**   The instructions must be considered as a whole, and when so considered, if they fairly and correctly state the law applicable to the case, they will be sufficient.

3.   **HOMICIDE—Verdict—Parties — Conviction and Acquittal.**   On a trial of two persons upon a charge of murder, the court properly instructed the jury that though one of the defendants should be found guilty, the other might be acquitted, and the forms of verdict in that respect were properly submitted.

(Syllabus by the Court.)

*Appeal from Superior Court, Tulsa County;*
*M. A. Breckenridge, Judge.*

Guy McKenzie and Joe Baker, convicted of murder, appeal. Affirmed.

*J. R. Charlton,* for plaintiff in error.

*Pat Malloy,* Co. Atty., for the State.

DOYLE, P. J. Charles T. Reuter, a prominent citizen and lawyer of Tulsa, was assassinated in his home in that city about one o'clock a. m. on the 5th day of May, 1912. The plaintiffs in error, Guy McKenzie and Joe Baker, together with Grover, alias "Bud" Belew, and Laura Reuter, his widow, were by information filed in the superior court of Tulsa county, jointly charged with his murder. The defendant, Laura Reuter, demanded and was granted a severance. The defendant, Grover, alias "Bud" Belew, was granted immunity and testified for the state. The state elected to try McKenzie and Baker first. Their trial began on the 5th day of October, 1912. The case was submitted to the jury on November 1, 1912, and on that day they rendered their verdict, finding Guy McKenzie and Joe Baker guilty of murder as charged, and assessing their punishment at imprisonment in the penitentiary at hard labor for life.

A motion for new trial was duly filed, overruled, and judgment was rendered in pursuance of the verdict. From the judgment the plaintiffs in error appeal.

The testimony establishes, or tends to establish, the following facts: The plaintiffs in error, Guy McKenzie and Joe Baker, for several months prior to the homicide, had been upon very friendly terms. Bud Belew had been in the employ of Guy McKenzie during that time. McKenzie was the owner of an automobile and Belew drove this car. His services were rendered without any stipulated salary; he would go to McKenzie and get whatever money he needed. Guy McKenzie and Laura Reuter, wife of the deceased, were frequently in each other's company. About a month before the homicide, Chas. T. Reuter went to the McKenzie home, called him out and among other things said to him: "Guy, I want you to keep away from my house; the people are talking about you, and if you don't keep away from my house I will kill you with a bigger gun than that you stole from me." That McKenzie continued to visit the Reuter home whenever Mr. Reuter was absent, and Mrs. Reuter would visit the McKenzie home; that the Reuters had serious family quarrels involving, among other things, the charge that Guy McKenzie was criminally intimate

with Mrs. Reuter. Two or three witnesses testified that Guy McKenzie tried to employ them to get Mr. Reuter out of the way. Guy McKenzie and Laura Reuter conspired to murder her husband; and they hired Joe Baker to commit the murder. He was promised two hundred dollars, to be paid by Mrs. Reuter, and what money he would get from the person of the deceased, but was to return to her Mr. Reuter's diamond ring and shirt stud, and in the event of his arrest she was to provide counsel for his defense. Shortly before the homicide, Joe Baker left the McKenzie home and went to the Reuter home; he was met at the basement door of the Reuter home by Mrs. Reuter, and was taken from the basement up to the living room and from the living room up stairs to the bed rooms, and was shown by her Mr. Reuter's bed room. Two paper hangers were working in the house that day. After Baker left Mrs. Reuter stated to the paper hangers that he was going to build a home and was looking over the plans of the house.

The day prior to the homicide, Guy McKenzie and Mrs. Reuter were seen standing near the garage at McKenzie's home. Joe Baker and Bud Belew were seen in the McKenzie car on the streets of Tulsa before midnight on the night of the homicide. That night Joe Baker left the McKenzie home in McKenzie's automobile, which was driven by Bud Belew. He had McKenzie's pistol and a flash light; they drove by the Reuter home, and shortly afterwards Baker left the car, carrying the pistol and flash light, and entered the Reuter home through the basement door and went up the steps into the living room and then up the stairs to the second story. Mrs. Reuter occupied a room on the west side, and Mr. Reuter a room on the other side of the hallway. He turned the key in the door leading to Mrs. Reuter's room, locking it from the outside, and entering Mr. Reuter's room, murdered him by shooting him twice through the head, and took the money that was in his clothes and a diamond ring and shirt stud. Mrs. Reuter screamed when the shots were fired and her screams and the shots aroused the neighborhood. Baker left the Reuter house by the way he had en-

tered and was seen by several persons. He was wearing an overcoat and a mask and was carrying the pistol and the flash light. Near the Reuter home, as he was leaving he met a young man named Ralph Johnson, and pointing the pistol at him commanded him to lay down. He returned to where the automobile was waiting and Belew drove the car north several miles; they stopped near a canyon and Baker took the overcoat, overalls, and hat that he had put on before entering the Reuter home, placed them on the ground poured a jug of coal oil that he had in the car over the clothes and set it on fire. They drove on through Turley and then turned into another road leading to Tulsa. They stopped the car again and Baker took the diamonds and hid them beside the road. He also threw away the pistol and the flash light. They then drove through Tulsa, coming in from the east, crossed the Arkansas river bridge and went on to Sapulpa, arriving there as daylight was breaking. They put the car into a garage and ordered that it be washed; then went to a rooming house and went to bed. They arose about mid-day and soon after left in the car for Tulsa.

When they arrived at Tulsa, Baker got out and Belew drove the car to McKenzie's. Guy McKenzie on the day before the homicide went to the town of Skiatook for the purpose of establishing an alibi; that evening Belew went to the depot to meet the train from Skiatook, expecting Guy McKenzie to return on that train. McKenzie did not return. Belew returned to the McKenzie home; Baker was there and said that he had seen the officers with blood hounds down town and suggested that it was best to take the car out of town. Belew got in the car and started for Skiatook. Near Sperry the car broke down. The next morning he fixed the car and started back to Tulsa. Reaching the McKenzie home, he found Joe Baker there, who told him that Guy McKenzie had been arrested, charged with the murder of Chas. T. Reuter. Guy McKenzie's sister, Stella, asked Belew if he knew anything about the killing, and he told her all about it.

The case thus made by the state was met almost exclusively by the general denial of the plaintiffs in error, who were sworn as witnesses in their own behalf.

McKenzie admitted that Mr. Reuter, about a month before his death told him to stay away from his place, saying, "If you don't stay away, I am going to shoot you with a bigger gun than you stole from me." He admitted that after that Bud Belew drove him and Mrs. Reuter and his sister, Stella McKenzie, to Broken Arrow in his automobile; and that he met Mrs. Reuter another time at a neighbor's. He denied having had any improper relations with Mrs. Reuter.

Baker admitted that he served a term for burglary, committed in Coffeyville, in the reformatory at Hutchison, Kan., and was paroled and came to Tulsa; and was there convicted several times of violating the prohibitory law; that in the afternoon of May 4th, he took his wife to the hospital in the McKenzie car, driven by Bud Belew; that he returned to the hospital that night, and left there about eleven p. m., that he then bummed around town until about two o'clock Sunday morning, and met Bud Belew, driving McKenzie's car; and Belew said, "Let's drive to Sapulpa," and he said, "I don't care if we do," and they drove to Sapulpa.

There are nine assignments of error. The first five are based upon certain instructions included in the charge given by the court. The objections made to these instructions are hypercritical. It has often been said, and we repeat here, that to require absolute technical accuracy in instructions would, generally speaking, defeat the ends of justice and bring the administration of the criminal law into disrepute and just contempt. It is sufficient when the charge of the court, considered as a whole, substantially presents the law of the case fairly to the jury.

Another assignment is that "The court committed material error in not instructing the jury as to the law of circumstantial evidence." Only a general exception was taken to the instructions given, and no request for an instruction on circumstantial

evidence was made. The response of counsel, as shown by the record, to the inquiry of the court upon the subject, was to the effect that they did not have any instructions to offer, suggest, or request. The record of the proceedings is as follows:

"Mr. Thompson: The defendants and each of them except to the action of the court in giving instructions numbered 3, 4, 8, 10, 11, 12, 13, 14, 15, 16, 18, 19, 20, 22; and the defendants further object and except to the action of the court in not allowing and giving the counsel for the defendants an opportunity to be present and argue the law of the instructions here given.

"The Court: I will give you a chance now. Let the record show that I presented the instructions both to Mr. Thompson and Mr. Charlton for the defense, and requested of them to look at the instructions; that if they had any instructions to offer the same, or if they had any modifications which they desired as to the instructions which the court had prepared, and which the court handed to them for their inspection before delivery to the jury, to suggest the same."

While it is true, as counsel assert, that nearly all of the evidence which the state introduced in this case was circumstantial, yet there was direct and positive evidence of the guilt of the plaintiffs in error in addition to the testimony of the accomplice Belew. If counsel desired to have the jury instructed as to the law of circumstantial evidence, they should have prepared an instruction and should have requested the court to give it. They did not do so, and are in no position to complain.

The next assignment is that the court erred in submitting to the jury certain forms of verdict with instructions what to do if they found one of the defendants guilty and the other not guilty.

The contention made is destitute of merit. Our Procedure Criminal provides:

"On an indictment or information against several, if the jury cannot agree upon a verdict as to all, they may render a verdict as to those in regard to whom they do agree, on which a judgment must be entered accordingly, and the case as to the rest may be tried by another jury." (Section 5924, Rev. Laws 1910.)

The defendants in this case were prosecuted upon a charge of murder, conjointly committed, in that all the defendants conspired and confederated to commit the murder, and all were concerned in its commission, and the defendants not present when the murder was committed did in that way aid and abet in its commission. Our penal code defines as principals, all persons concerned in the commission of crime,

"whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present." (Rev. Laws 1910, sec. 2104.)

—and the court properly instructed the jury that though one of the defendants should be found guilty and the other might be acquitted, and the forms of the verdict in that respect were properly submitted. Excepting certain offenses which cannot be committed by a single person, defendants charged jointly and tried together are each entitled to have the jury pass upon the question of his individual guilt or innocence, and no one can be convicted without proof of individual guilt.

The next assignment is that the court erred in receiving the verdict in this case from the bailiff and not from the foreman of the jury.

This contention is not sustained by the record and has no merit.

Finally it is contended that the verdict is contrary to the evidence and should have been set aside by the trial court. The point attempted to be made by the defendants' counsel, that exclusive of the testimony of Bud Belew, there is no testimony in the case that tends to connect the defendants with the murder, is clearly untenable. It is true that the case against the defendants depends in a large measure upon the testimony of an accomplice. But his testimony is strongly and fully corroborated upon all material points. We deem it unnecessary to detail further the facts disclosed by the record. We forbear to unveil the folly and frailty of the wife, whose conduct, the evidence shows, robbed her husband of his life and her unfortunate children of the protecting care of a father. It is suffi-

cient to say that a fuller statement would show a much stronger case against the defendants.

We, have given this case a patient and careful examination, and our conclusion is that the only debatable question in the case for the jury to consider was whether the punishment to be assessed should be death or imprisonment for life. The trial of the case occupied some twenty-six days, and the case-made contains more than twenty-six hundred·pages. Instead of a case-made, containing a transcript of the evidence, and the record proper, a complete transcript of all preliminary proceedings, covering some six hundred pages, is included therein at the cost of the county, in the face of the fact that no exception was reserved in these preliminary matters, and no question raised thereon in the motion for a new trial. Such practice is not only an ·imposition on this court, but creates an unnecessary and unwarranted expense upon the county in which the trial was had. The judges of trial courts should prevent such practice, and should not allow such unnecessary expense.

Our conclusion is that this case has been well and fairly tried, and, considering the nature of the case and the length of the trial, the record is unusually free from error. There being no prejudicial errors shown by the record, the judgment appealed from will be affirmed.

FURMAN and ARMSTRONG, JJ., concur.